**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

# FILED

JUN 2 9 2009

**U.S. DISTRICT COURT**
**CLARKSBURG, WV 26301**

ALICE M. SMALLWOOD,

    **Plaintiff,**

v.           **CIVIL ACTION NO. 2:08CV68**
             (Judge Maxwell)

MICHAEL ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

    **Defendant**.

## REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on cross Motions for Summary Judgment and has been referred to the undersigned United States Magistrate Judge for submission of a Report and Recommendation. 28 U.S.C. § 636(b)(1)(B).

## I. Procedural History

Alice M. Smallwood ("Plaintiff") filed her application for DIB on September 18, 2004,[1] alleging disability as of July 1, 2000, due to post-polio sequelae, arthritis, fatigue, back and leg pain, sleep and memory problems, and depression (R. 40, 66).[2] The application was denied initially and

---

[1]Plaintiff filed a previous application for benefits on July 12, 2000, but failed to pursue her claim beyond the administrative level (R. 23).

[2]Social Security Ruling ("SSR") 03-1p provides:
"Postpolio sequelae" refers to the documented residuals of acute polioencephalomyelitis (polio) infection as well as other disorders that have an etiological link to either the acute polio infection or to chronic deficits resulting from the acute infection. Disorders that may manifest late in the lives of polio survivors include postpolio syndrome (also known as the late effects of

on reconsideration (R. 23). Plaintiff requested a hearing, which Administrative Law Judge ("ALJ") Randall Moon held on June 6, 2006 (R. 190-234). Plaintiff, who appeared *pro se*, testified, along with Vocational Expert Larry Bell ("VE"). The ALJ rendered a decision on November 24, 2006, finding that Plaintiff was not under a "disability," as defined in the Social Security Act, from July 1, 2000, through the date of the decision (R. 29). Plaintiff submitted new evidence and requested review by the Appeals Council.[3] The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 5).

## II. Statement of Facts

Plaintiff was born on August 27, 1953, and was 50 years old when she filed her application for DIB and 53 years old on the date of the ALJ's decision (R. 29). Both ages are considered "closely approaching advanced age." She has a high school education and past work as an in-home health care aide (R. 24).

Plaintiff suffered from polio as a child, which resulted in a number of surgeries to her left leg, leaving that leg 3/4" shorter than the right. There was a left ankle ankylosis and that ankle was fixed at 10 degrees of plantar extension with no active dorsiflexion or plantar extension (R. 145). She

poliomyelitis), early advanced degenerative arthritis, sleep disorders, respiratory insufficiency, and a variety of mental disorders. Any one or a combination of these disorders, appropriately documented, will constitute the presence of "postpolio sequelae" for purposes of developing and evaluating claims for disability on the basis of postpolio sequelae under Social Security disability. Even though some polio survivors may have had previously undetected motor residuals following the acute polio infection, they may still report progressive muscle weakness later in life and manifest any of the disorders listed above.

[3]The new evidence consisted in part of a State agency consultative examination performed two months after the ALJ's decision, and a favorable determination based on that examination, in March 2007, finding Plaintiff disabled as of November 25, 2006, the day after the ALJ's decision in this matter.

wore a brace for that ankle, without which she would trip over her left foot.

On July 31, 2002, Plaintiff presented to her doctor for follow up of her test results (R. 108). She said she felt well other than mild upper chest pain and burning. She was diagnosed with atypical chest pain "probably reflux," and was provided Aciphex samples.

Plaintiff fell and injured her left leg on July 27, 2003 (R. 99). She went to the emergency room where x-rays showed no fracture.

On July 31, 2003, Plaintiff presented to her doctor for a follow-up from the ER visit (R. 107). She also complained of shoulder pain from injuring herself getting into a truck months earlier. She said she could not raise her arm above shoulder level. The doctor found Plaintiff's knee very swollen. She could not adduct her shoulder. She was diagnosed with contusion/sprain of the left knee and adhesive capsulitis of the shoulder.

An MRI of the shoulder on August 5, 2003, showed mild degenerative changes but no significant impingement off the supraspinatus muscle or tendon. The impression was negative (R. 116).

On August 14, 2003, Plaintiff presented to her doctor to follow up on her leg and shoulder pain (R. 106). She said her shoulder still hurt. Bextra was helping the pain, and physical therapy was helping her increase movement of her arm. She was again diagnosed with adhesive capsulitis of the left shoulder.

On September 11, 2003, plaintiff presented to her doctor for left shoulder pain (R. 105). She also said she had fallen and injured her left knee. Plaintiff said that physical therapy was helping her shoulder. She was again diagnosed with adhesive capsulitis.

On August 19, 2004, Plaintiff presented to her doctor for complaints of back pain, bilateral

3

leg pain and fatigue/depression for the past couple of months (R. 104). She had poor sleep due to pain. Tylenol provided minimal relief. She felt the weakness was worsening, independent of the pain. The doctor planned to send her for a sleep study. Plaintiff's husband said she snored and stopped breathing in her sleep. She was diagnosed with fatigue, myalgias, and probable sleep apnea.

A left hip x-ray on August 24, 2004, showed no evidence of fracture or dislocation (R. 113). There were possible arthritic degenerative changes. Lumbar spine x-rays showed some straightening of the lordotic curve, but otherwise all spaces maintained (R. 114). Left knee x-ray showed no evidence of fracture or dislocation (R. 115).

On September 11, 2004, Plaintiff underwent a sleep study which indicated she had mild obstructive sleep apnea, but also indicated:

> This patient was also noted to have an increased number of spontaneous arousals. While this may be secondary to an exaggerated first-night effect, other possibilities include reflux, chronic pain, or the upper airway resistance syndrome. If this latter diagnosis is responsible, this would significantly increase the number of arousals secondary to respiratory obstructive events.

(R. 129). The doctor, a specialist, noted Plaintiff had a sleep latency of nearly three hours "with a rather poor sleep efficiency of 52.1% . . . ." After the three hours it took her to fall asleep, it took an additional two hours for her to reach REM sleep. Finally: "There were noted to be 13.6 spontaneous arousals per hour." Id.

Plaintiff's application for benefits was filed on September 18, 2004.

On September 21, 2004, Plaintiff presented to her doctor for follow up of her test results (R. 103). She said she hurt in her shoulders, arms, back, hips, knees, and ankles. She was diagnosed with fatigue and myalgia–possibly fibromyalgia. Bextra was helping with her pain. She was prescribed Ambien and discussed the possibility of a CPAP trial if her sleep did not improve with

4

the additional pain control and sleep medication.

On October 26, 2004, Plaintiff presented to her doctor for follow up of her fibromyalgia, post polio syndrome, and insomnia (R. 102). She was sleeping better with Ambien and Lorcet, and felt calmer.

Plaintiff underwent a psychological evaluation by Morgan D. Morgan, M.A. at the request of the State agency on November 25, 2004 (R. 137). She appeared appropriately groomed and attired, and was cooperative and compliant throughout the assessment. No abnormalities were noted with posture, "although she did walk with a limp." She did not report any mood problems, aside from becoming occasionally frustrated due to her physical limitations. She did not report a history of significant interpersonal relations difficulties. She did say he had difficulty falling asleep and maintaining sleep due to pain. She reported infrequent crying spells. She described her energy level as "very low," which the psychologist noted was not congruent with her display during the assessment, as "she appeared to have a normal amount of energy."

Upon mental status examination, Plaintiff was properly attired and had good hygiene and grooming. She was cooperative and compliant, "although somewhat tense at the beginning of the assessment." Her eye contact was good and she was spontaneous. Speech was normal and she was extroverted and friendly. She was fully oriented. Her mood was happy, although she was marginally tense at the beginning and often giggled after making statements. Her affect was broad and normal. She did not display symptoms of psychosis and her thoughts were organized. Insight was mildly deficient.. Judgment was normal and she did not display suicidal or homicidal ideation. Recall was within normal limits. Her concentration was mildly deficient. Her IQ was 95 verbal, 92 performance, and 94 full scale. She read and did math at the high school level, but spelled at only

5

the 5th grade level. She reported she had always been a bad speller. Plaintiff did not report significant emotional difficulties, and did not report a history of depression.

Plaintiff reported her daily activities as rising at 9:00 a.m., maintaining her own personal hygiene, cooking about three times a week (which took about one half hour), and cleaning her house on a daily basis (but wearing out easily after one half hour.) She washed dishes, swept the floor, and made the bed, and did laundry about two or three times a week. She performed these tasks by working for about 15 minutes at a time. She drove herself regularly, ate at restaurants, and went shopping about once a week, spending two hours shopping. She read for about two hours, watched television, and on occasion did some sewing. She had a small social network comprised of close family. She visited her mother twice a week, spending an hour per visit, visited with her sisters upon occasion, and attended church one day a week. The psychologist found Plaintiff's interactions during the evaluation were appropriate and deemed her social functioning to be within normal limits. Her concentration and pace were mildly deficient. Mr. Morgan did not diagnose any mental impairment (R. 149).

Plaintiff underwent a consultative physical examination at the request of the State agency on December 7, 2004, performed by Arturo Sabio, M.D. (R. 142). Her chief complaints were listed as post-polio syndrome, arthritis pains in the knees, ankles, hips and shoulders, and sleep problems. She was taking Prevacid, Bextra, Ambien, Lorcet, and Effexor. Upon physical examination, Plaintiff was 5'1" and weighed 181 pounds (R. 144). Dr. Sabio considered her moderately obese. There was tenderness over the left hip. Plaintiff had a pelvic tilt to the left and lisps [sic] on the left on standing. She had a short left leg, 3/4 inch shorter than the right. She had left ankle ankylosis, meaning her ankle was fixed at 10 degrees of plantar extension. There was no active dorsiflexion

of the left ankle, and there was muscle atrophy of the left peroneal muscles.

Dr. Sabio noted tenderness over the lumbar spine along with spasms of the left lumbar muscle. Cervical range of motion was 45 degrees lateral flexion; 60 degrees flexion; 75 degrees extension; and 80 degrees rotation, bilaterally. The right ankle allowed 20 degrees of dorsiflexion and 40 degrees of plantar extension (R. 145). There was a left ankle ankylosis and the left ankle was fixed at 10 degrees of plantar extension with no active dorsiflexion or plantar extension. The mid thigh circumference was 54 cm on the right and 51 cm on the left. The mid-calf circumference was 42 cm on the right on 36 on the left. Dr. Sabio opined: "This is abnormal, showing muscle atrophy on the left leg." Deep tendon reflexes were normal. Babinski reflex was negative bilaterally. Plaintiff could walk on her heels, walk on her toes, and walk heel-to-toe in tandem. She was able to stand on either leg separately and she was able to squat fully.

Dr. Sabio's impression was postpolio syndrome,[4] short left leg, degenerative arthritis, and chronic pain syndrome (R. 145). He noted Plaintiff could walk with a brace, but otherwise tripped and fell because of the plantar extension of the left ankle. "She has no active dorsiflexion and she

---

[4] SSR 03-1p provides:

According to the National Institute of Neurological Disorders and Stroke (NINDS), postpolio syndrome is a condition that affects polio survivors anywhere from 10 to 40 years after recovery from an initial paralytic attack of the poliomyelitis virus. The NINDS states that postpolio syndrome is characterized by a further weakening of muscles that were previously affected by the polio infection. The signs and symptoms include fatigue, slowly progressive muscle weakness, and, at times, muscular atrophy. The NINDS states that joint pain and increasing skeletal deformities such as scoliosis are common. Not all polio survivors experience these clinical problems, and the extent to which polio survivors are affected by postpolio syndrome varies. The onset of new or worsening signs and symptoms is associated with a further reduction of the individual's capacity to independently carry out activities of daily living.

essentially trips on her toes when she walks." He also noted her short left leg "has caused her to have left hip pain and low back pain" and she complained of pain in her knees and hips. He also found degenerative arthritis of the left hip and left knee and chronic low back pain from the short let leg.[5] He noted her complaints of problems sleeping due to pain, and her complaints that her memory was impaired due to the poor sleep. She did not appear to have any mood disorder, however, and was able to respond appropriately to questions and relate her history.

James Capage, Ph.D., a State agency reviewing psychologist, completed a Psychiatric Review Technique ("PRT") on December 21, 2004, finding Plaintiff had no medically determinable mental impairment (R. 148).

A State agency decision-maker (non-medical doctor) completed a Physical Residual Functional Capacity Assessment ("RFC") on December 22, 2004, finding that Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently (R. 59). She could stand/walk about six hours in an eight-hour workday and sit about six hours in an eight-hour workday. She could never climb ladders, ropes or scaffolds and could occasionally perform all other postural movements. She had no other limitations. The decision-maker opined that Plaintiff's reports of pain were not fully

---

[5] SSR 03-1p further provides:

Polio survivors often manifest motor residuals in a single extremity and thus function day-to-day with chronic postural imbalance. Clinicians have described degenerative musculoskeletal disorders etiologically linked to long-standing postural imbalance. Abnormal weight-bearing in polio survivors produces exaggerated wear and tear on the bones and joints of the spine or limbs that are overused to compensate for limbs weakened by polio. Early onset of advanced degenerative arthritis can be found in a compensatory extremity or spine. Where such an etiological relationship is clear, clinically documented early advanced degenerative arthritis in a compensating limb or spine is considered one of the postpolio sequelae.

supported by the record and would not preclude light exertional activity (R. 63).

State agency reviewing physician Cynthia Osborne, DO, completed a physical RFC on June 29, 2005, based on post-polio deficits (R. 162). She found Plaintiff could occasionally lift 20 pounds and frequently lift 10 pounds. She could stand/walk about six hours in an eight-hour workday, sit about six hours in an eight-hour workday, and push or pull to the limits shown for lifting/carrying. She could never climb ladders, ropes or scaffolds, but could occasionally perform all other posturals. She should avoid concentrated exposure to extreme cold and hazards.

Dr. Osborne found Plaintiff's complaints of pain and limitations only partially credible, in that her activities of daily living were inconsistent "in that she has no self-care deficits and is able to shop for 45-60 minutes yet she states she can't walk 100 feet, has normal strength and ROM of upper extremities but states she can't lift over five pounds" (R. 167). She reduced Plaintiff's RFC to light with the additional limitations noted.

On September 21, 2005, Plaintiff presented to her treating physician for an annual physical (R. 179). She complained of her right arm hurting, her hands aching and tingling at night, and her feet and legs aching at night. She felt like she had to move all the time, and had kicked her husband in bed. She felt better if she got up and walked around. The doctor refilled Plaintiff's Lorcet, Ambien, and Prilosec, started her on Requip and Neurontin, and recommended an EMG and sleep study.

On November 7, 2005, Plaintiff presented to her treating physician, with complaints of worsening sleep and pain (R. 178). She said the Neurontin was not helping at all. Upon examination Plaintiff had crepitation and tenderness over the right shoulder. The doctor prescribed Cymbalta, and diagnosed osteoarthritis, chronic pain, and depression due to pain. The doctor gave

Plaintiff an injection for her shoulder (R. 177).

On January 16, 2006, Plaintiff's treating physician wrote a "To Whom it May Concern" letter, stating that Plaintiff was under her care "for a variety of medical issues including chronic pain likely secondary to fibromyalgia, post polio syndrome, gastroesophageal reflux disease, osteoarthritis, and depression" (R. 175).

On June 5, 2006, plaintiff presented to her treating physician for follow-up, refills of her prescription, and for a possible bladder infection (R. 176). She was also concerned that her back was "starting to curve" The doctor diagnosed osteoarthritis, chronic pain, fibromyalgia syndrome, GERD, insomnia, and "short leg syndrome." She prescribed Lyrica and Vicoprofen.

At the administrative hearing held on June 6, 2006, Plaintiff was present without counsel (R. 192). The ALJ advised Plaintiff that she had the right to have an attorney or someone else help with her case. He in fact noted that Plaintiff had been in contact with an attorney. Plaintiff candidly admitted that the attorney "said I didn't have enough records, medical records, to prove the case," so she "just didn't . . . go on to try to find another attorney" (R. 192). The ALJ gave her an opportunity to try to find someone to help her, but Plaintiff said she was prepared to go forward.

Plaintiff testified that her husband worked as a union carpenter, leaving at about five in the morning and getting home at five or six at night (R. 213). She sometimes cooked for him, but he also brought food home or cooked himself. She would wake up in the morning to tell him good-bye, and then go back to sleep. She straightened up the house and sometimes did a load of laundry, explaining she threw everything down the stairs, then she put the laundry in the machines, and then her husband would carry it back upstairs.

Plaintiff testified that she had three outside cats that took care of themselves. All she had to

do was feed them (R. 214). She no longer gardened. She watched televison and read during the day. She talked to her sister and her mother. She visited her mother quite often, even though her mother did not always even know who she was. Her mother lived next door to her sister. She would just sit with her mother and sometimes fix her a sandwich, but her sisters came in and cooked and did the laundry. She hadn't been to church in a year, because she could not get up and get ready on time, and because she could not sit on the wooden pews.

Plaintiff testified she was taking Cymbalta for depression and fibromyalgia, and she believed it was helping with her depression, because she thought it was the reason she could now "do a little sewing and stuff." She was taking Ambien, but only when she really couldn't sleep because it dragged her out and the next day she couldn't do anything (R. 217). The ALJ asked, "So it works?" and Plaintiff responded: "It works, yes. You can't comprehend what's going on the next day."

Plaintiff testified she could walk only about a half a block (R. 220). When she grocery shopped it took her about 45 minutes to an hour, because she stopped often. She could not stand for an hour at a time to do laundry or cook, so she usually sat down at the table or on the bed to do those things. She had to keep moving, and would get up and move around, then would lie down on the bed or couch, or sit, because she just kept "fidgeting and moving." She believed she would sit for about an hour in an eight-hour day, but not all at one time. She was not sure how much time she spent standing because she would usually walk for a few minutes and then sit back down. She could not stand still very much because it put weight on her bad hip. Walking was easier than standing still, but sitting was worse than walking. She walked probably less than two hours in an eight-hour day.

Plaintiff testified she believed she could carry a gallon of milk (R. 223). She did not usually

11

walk to the mailbox to get the mail. She occasionally washed the dishes, but used paper plates a lot instead. She made the bed if company was coming. Her husband helped her change the sheets. He also did most of the vacuuming and mopping. She did not iron, but did fold clothes. She did no yard work. She paid the bills using a checking account.

> When asked if she had anything more to say about her conditions, Plaintiff testified:

> Just trying to read through my notes here. I don't have a lot of the doctor reports and stuff like they said I needed because I've just not went to the doctor because I didn't think there was anything they could do for it because it's been a lifelong thing. I had polio when I was three months so I have learned, you known, to adjust to it, and I never even thought about the Social Security until everybody says, you, known, you should qualify for it. And I got through doing the research and realized that I really do qualify for it because the stuff just keeps reoccurring and keeps progressing to the point I can't do the stuff.

(R. 227).

The ALJ asked the Vocational Expert ("VE") a hypothetical for an individual of Plaintiff's age, education and work experience, limited to light or sedentary work with additional postural limitations. The VE testified that Plaintiff could not perform any of her past relevant work, but there were jobs at the light and sedentary exertional level that she could perform with the limitations provided by the ALJ.

### Evidence Submitted to the Appeals Council

The ALJ issued his decision on November 24, 2006, finding Plaintiff was not under a disability, as defined in the Social Security Act, at any time from July 1, 2000, through the date of his decision (R. 29).

Plaintiff, still proceeding *pro se*, filed her Request for Review of the ALJ's decision on December 13, 2006 (R. 18).

Plaintiff appointed counsel to represent her on March 14, 2007 (R. 12). Counsel requested an enlargement of time for submission of additional evidence and argument on March 29, 2007, which request was granted by the Appeals Council. On April 27, 2007, Plaintiff, through counsel, submitted new evidence to the Appeals Council, as follows:

On January 30, 2007, two months after the ALJ's decision finding Plaintiff not disabled, Plaintiff underwent a second physical examination upon referral of the State agency (R. 185). The second examination was performed by Arturo Sabio, M.D., the same physician who performed the first examination in 2004.

Dr. Sabio listed Plaintiff's chief complaints as leg, hip and back pain (R. 185). Upon examination, Dr. Sabio again found Plaintiff to be moderately obese at 5'1" and 187 pounds (R. 186). She ambulated with a normal gait, without ambulatory aids, and was stable at station. All ranges of motion were the same as in the 2004 examination. There was no tenderness of the spine (R. 187). It was noted that Plaintiff had a left footdrop. There was tenderness of the ankles, and she walked with a left ankle splint to prevent tripping. The left leg was 3/4" shorter than the right. Neurological testing results were the same as in 2004. There was no pain of the spine or tenderness of the back. The right thigh and calf were again each three inches smaller in circumference than the left, as in 2004 (although all were smaller by one inch). Babinski reflex was still negative. At this examination, Dr. Sabio found, however, that Plaintiff could not walk on her heels or toes, and was not able to bear weight on her left leg. She could walk heel-to-toe tandem with her ankle splint. She could squat fully.

Dr. Sabio's diagnostic impression was chronic back strain secondary to short left leg, which was due to the previous polio; chronic pain in the left ankle secondary to previous operations; and

left footdrop (R. 188).

Although it was submitted to the Court and does not appear in the record, the undersigned notes Plaintiff submitted the Disability Determination and Transmittal dated March 30, 2007, finding her disabled as of November 25, 2006, the day after the ALJ's decision. The primary diagnosis was listed as chronic back strain and the secondary diagnosis as foot drop. The decision indicated Vocational Rule 201.12 was used as a guide.

On March 28, 2008, the Appeals Council denied Plaintiff's Request for Review of the current claim, stating it had considered the reasons Plaintiff disagreed with the decision and the additional evidence Plaintiff submitted, but "found that this information does not provide a basis for changing the Administrative Law Judge's decision" (R. 5-6). In particular:

> The Appeals Council also considered the fact that since the date of the Administrative Law Judge's decision, you were found to be under a "disability" beginning November 25, 2006, based on the application you filed on December 13, 2006. This favorable determination was based on a report of a consultative examination performed on January 30, 2007 which reflects some deterioration in your condition. Therefore, the Appeals Council finds that this information does not warrant a change in the Administrative Law Judge's decision.

(R. 6).

## III.  Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520, the ALJ made the following findings:

1.   The claimant meets the insured status requirements of the Social Security Act through June 30, 2008.

2.   The claimant has not engaged in substantial gainful activity since July 1, 2000, the alleged onset date (20 CFR 404.1520(b) and 404.1571 *et seq.*).

3.   The claimant has the following severe combination of impairments: post-

polio syndrome with a shortened left leg, degenerative arthritis, and chronic pain syndrome (20 CFR § 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that exertionally, due to her post-polio syndrome with a shortened left leg, degenerative arthritis and chronic pain syndrome, the claimant has the residual functional capacity to lift and carry weights of up to ten pounds frequently and twenty pounds occasionally, sit up to six hours in an eight-hour day for intervals of thirty minutes at one time, and stand or walk up to six hours in an eight-hour workday at intervals of thirty minutes at one time, i.e., she must be able to change positions after sitting, standing or walking for thirty minutes. Nonexertionally, her post-polio residuals affecting her left leg, pain (from all conditions, including fibromyalgia), and fatigue (from mild sleep apnea) preclude working around unprotected heights, dangerous moving machinery and cold temperature extremes. She also cannot climb ladders, ropes or scaffolds sue to her post-polio syndrome, and can only occasionally climb stairs and ramps, crouch, balance, stoop, kneel and crawl. Since she does not have a medically determinable mental impairment, she has no additional functional limitations on her ability to perform the basic mental demands of competitive work on a sustained basis.

6. The claimant is unable to perform any of her past relevant work (20 CFR § 404.1565)

7. The claimant was born on August 27, 1953 and was 46 years old on the alleged disability onset date, which is defined as a younger individual age 45-49. As of August 27, 2003, the claimant attained age 50 and is currently 53 years old, which is defined as a person closely approaching advanced age (20 CFR § 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR § 404.1564).

9. The claimant's past relevant work ranged from unskilled to semi-skilled according to vocational expert testimony, and she did not acquire skills that are transferable to work within her residual functional capacity (20 CFR § 404.1568).

10. Considering the claimant's age, education, work experience, and residual

functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c) and 404.1566).

11.    The claimant was not under a "disability," as defined in the Social Security Act, from July 1, 2000, through the date of this decision (20 CFR § 404.1520(g)).

(R. 23-29).

# IV. DISCUSSION
## A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit held, "Our scope of review is specific and narrow. We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence." Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" Hays, 907 F.2d at 1456 (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or

misapplication of the law." <u>Coffman v. Bowen</u>, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Contentions of the Parties

Plaintiff contends:

1.    The ALJ's decision is not supported by substantial evidence because the Commissioner subsequently found Ms. Smallwood disabled due to the same impairments considered by the ALJ in this claim.

2.    The ALJ's decision is not supported by substantial evidence and he committed an error of law because he failed to consider, or even mention, SSR 03-1p: Development and Evaluation of Disability Claims Involving Postpolio Sequelae.

Defendant contends:

1.    Plaintiff's condition deteriorated, and the Commissioner, when reviewing Plaintiff's second claim for benefits, awarded benefits based upon different impairments and a different degree of functional limitations.

2.    The ALJ complied with SSR 03-1p.

## C. The Subsequent Favorable Decision

Plaintiff first argues her claim could have easily been adjudicated in her favor pursuant to the grid rules with a sedentary RFC, but that the ALJ erroneously found she had a light RFC.[6] Further, shortly thereafter the Commissioner found she "became disabled" the very next day after the ALJ's unfavorable decision pursuant to a sedentary grid rule. Defendant contends that Plaintiff's claim that the Commissioner found her to be disabled based on the same impairments that the ALJ considered when he issued his decision on November 24, 2006, has no merit because Plaintiff's impairments, namely one involving her use of her left leg, changed after the ALJ's decision.

There is no dispute that the ALJ found Plaintiff was not disabled as of November 24, 2006

---

[6]If she were found to be limited to sedentary work, Plaintiff would be considered disabled pursuant to Grid Rule 201.12.

(R. 29). Pursuant to a subsequent claim, the Administration sent Plaintiff for a second consultative examination on January 30, 2007, only two months after the ALJ's decision. The examination was again performed by Dr. Sabio, the same physician who performed the first consultative examination in 2004. He diagnosed Plaintiff with "chronic back strain secondary to short left leg, which was due to the previous polio; chronic pain in the left ankle secondary to previous operations; and left footdrop." On March 30, 2007, the Administration found Plaintiff was disabled as of November 25, 2006, the day after the first ALJ decision. The primary diagnosis was listed as chronic back strain and the secondary as left footdrop. The decision indicated that Vocational Rule (Grid Rule) 201.12 was used as a guide. The present claim was still before the Appeals Council and Plaintiff submitted the new evidence (generated by the State agency) and decision to the Appeals Council.

On March 28, 2008, the Appeals Council denied Plaintiff's Request for Review of this current (Plaintiff's former) claim, stating it had considered the reasons Plaintiff disagreed with the decision and the additional evidence Plaintiff submitted, but "found that this information does not provide a basis for changing the Administrative Law Judge's decision" (R. 5-6). In particular:

> The Appeals Council also considered the fact that since the date of the Administrative Law Judge's decision, you were found to be under a "disability" beginning November 25, 2006, based on the application you filed on December 13, 2006. This favorable determination was based on a report of a consultative examination performed on January 30, 2007 which reflects some deterioration in your condition. Therefore, the Appeals Council finds that this information does not warrant a change in the Administrative Law Judge's decision.

(R. 6).

Pursuant to 20 CFR § 404.970(b), the Appeals Council shall consider evidence submitted with a request for review if the evidence is new, material, and relates to the period on or before the dates of the ALJ's decision. Evidence is material if there is a reasonable possibility that the new

evidence would have changed the outcome.  <u>Wilkins v. Secretary, Dept. of Health and Human Services</u>, 953 F.2d 93, 96 (4th Cir. 1991).  There is no doubt the evidence Plaintiff submitted was new.  The Appeals Council found it was not material, however, because it would not have changed the outcome of the prior claim.

Here there is some evidence that Plaintiff's condition may have deteriorated since her last consultative examination in 2004.  At the 2004 examination, Dr. Sabio found Plaintiff could walk on her heels and toes and could bear weight on her left leg.  At the 2007 examination, however, he found that Plaintiff could not walk on her heels or toes, and was not able to bear weight on her left leg.  Both the Appeals Council and the Commissioner base their arguments on this apparent "deterioration."  The undersigned agrees that there appears to have been some deterioration between 2004 and January 2007.  There is, however, absolutely no evidence of when that deterioration occurred.  There is no evidence of trauma or injury to Plaintiff between November 25, 2006, and January 30, 2007.  In the second decision, the Commissioner, pursuant to its Regulations, found Plaintiff disabled as of the day after the prior unfavorable ALJ decision.

Although not precedential in this District, the District Court for the Southern District of West Virginia had a similar case.  In <u>Bradley v. Barnhart</u>, 463 F.Supp.2d 577, 117 Soc.Sec.Rep.Serv.58 (S.D.W.V. 2006), the ALJ concluded on April 26, 2005, that the claimant was not disabled.  On September 28, 2005, the SSA determined the claimant was disabled as of April 27, 2005, the day after the first unfavorable decision.  There, as here, the Commissioner contended that the medical evidence which was considered for purposes of the subsequent application was generated two months after the first ALJ decision, and "apparently demonstrated that Plaintiff's conditions worsened in the two months following the ALJ's decision . . . ."

In Bradley, United States District Judge Copenhaver found the evidence of the new favorable decision was material, stating:

> If the SSA awarded benefits on the second claim based upon the evidence received in June 2005, with an onset date coming just one day after the date of an earlier denial, that documentation, and the decision which resulted from it, would seem likely to be of a significant and substantial character in relation to the earlier claim. The first and second Wilkins requirements are thus satisfied.
>
> The tight time line here also provides reasonable cause to believe the new and material evidence relates to the period on or before the date of the ALJ's denial of benefits. It is important to note in this regard that the evidence need not have existed on or before the date of the decision. It need only relate to that period. Here, the medical evidence was received by the Commissioner in June 2005. It obviously existed prior to the time it was received, putting it in close temporal proximity to the April 26, 2005, unfavorable decision by the ALJ . . . .[7]

Significantly to Plaintiff's case, Social Security Ruling ("SSR") 03-1p, regarding post-polio sequelae, provides:

> A disability onset date in cases involving postpolio sequelae is set based on the individual's allegations, his or her work history, and the medical and other evidence concerning impairment severity. Generally, the new problems associated with postpolio sequelae are gradual and non-traumatic, but acute injuries or events, such as herniated discs, or broken bones from falls, may be markers for establishing a disability onset date. For additional discussion concerning the determination of onset date, refer to SSR 83-20, "Titles II and XVI: Onset of Disability."

(Emphasis added). Here, as in Bradley, the new evidence which resulted in the favorable decision of March 2007, was generated only two months after the first, unfavorable decision. Additionally, the January 2007 examination was performed at the request of the State agency. There is no evidence that Plaintiff suffered some type of trauma after November 25, 2006, that caused her condition to deteriorate within the next two months. Clearly, if Plaintiff's condition had deteriorated,

-----

[7]In Bradley, the new evidence was submitted to the Court, which remanded the claim to the Commissioner. Here the new evidence was submitted to the Appeals Council, which rejected Plaintiff's request for reconsideration.

it did so sometime between December 7, 2004 and January 30, 2007.

Upon consideration of all which, the undersigned finds substantial evidence does not support the Appeals Council's determination that the new evidence did not provide a basis for changing the ALJ's decision.

### D. SSR 03-1p

Plaintiff also argues the ALJ erred by failing to comply with SSR 03-1p, which provides for the development and evaluation of claims involving postpolio sequelae. Defendant contends Plaintiff's argument has no merit because the ALJ complied with SSR 03-1p by considering her functional limitations resulting from her postpolio sequelae; discussing her limitations from her breathing and sleep difficulties, fatigue, memory and concentration issues, orthopedic complaints, and reflux; and correctly rejected Plaintiff's assertion that limitations from her impairments disabled her because she remained active and received only intermittent treatment. In particular Defendant notes:

> Plaintiff also claims that the ALJ erred because he did not link her sleep disorder to polio . . . .This claim has no merit because as the record shows, Plaintiff did not even bother returning for follow-up care after being diagnosed with sleeping problems . . . . Moreover, treatment for Plaintiff's sleep condition was conservative, including a recommendation to lose weight . . . .

Plaintiff is correct that the ALJ never mentioned SSR 03-1p, which provides for development and evaluation of disability claims involving postpolio sequelae. As already noted, disorders that may manifest late in the lives of polio survivors include postpolio syndrome (also known as the late effects of poliomyelitis), early advanced degenerative arthritis, sleep disorders, respiratory insufficiency, and a variety of mental disorders. Any one or a combination of these disorders, appropriately documented, will constitute the presence of "postpolio sequelae" for purposes of

21

developing and evaluating claims for disability on the basis of postpolio sequelae under Social Security disability. Even though some polio survivors may have had previously undetected motor residuals following the acute polio infection, they may still report progressive muscle weakness later in life and manifest any of the disorders listed above.

There is no dispute in this case that Plaintiff had polio as a child, that it caused weakening and shortening of her leg, or that she has now been diagnosed with postpolio syndrome.

Defendant is also correct in stating that the ALJ did discuss Plaintiff's postpolio syndrome and did provide limitations in his hypothetical based on her postpolio syndrome. Plaintiff in particular argues that the ALJ did not fully relate Plaintiff's alleged sleep problems to her postpolio syndrome, and therefore erred by finding her sleep disorder a non-severe impairment. SSR 03-1p provides, in pertinent part:

> Some polio survivors report the occurrence of sleep disorders that are determined by clinical evaluation to be related to respiratory insufficiency during sleep. The poliovirus has demonstrated a propensity to attack the motor neurons responsible for respiratory function, and, during the acute infection, some individuals require ventilatory assistance. For example, years ago patients with acute polio infection were placed in an "iron lung" for ventilatory assistance. Some patients who required such assistance recovered and may have returned to normal lives without obvious signs of respiratory insufficiency. Some polio survivors, however, have reported the onset of sleep disorders years following the acute polio infection, and physicians have linked these sleep disorders to weakening of the respiratory musculature. During sleep, even slight weakness of the respiratory musculature may become clinically significant and interfere with breathing capacity. Chronic sleep deprivation resulting from repeated episodes of sleep apnea may result in the development of excessive daytime drowsiness or cognitive and behavioral changes.

Plaintiff had a polysomnogram performed in order to determine the extent and possible cause of her sleep problems and fatigue. Dr. Charles Porterfield, a Diplomate of the American Board of Sleep Medicine and a Fellow in the American Academy of Sleep Medicine, performed the test. He

noted:

> Technical data demonstrated a sleep latency of 166.8 minutes with a rather poor sleep efficiency of 52.1%. Sleep architecture demonstrated an increase in stage four. Latency to REM was increased to 125.5 minutes. There were 30 hypopneas and 2 central apneas for overall RDI of 9.5, with 9.2 per hour to arousal. Saturation nadir was 90% and snoring was mild at 3/10. There were noted to be 13.6 spontaneous arousals per hour.

Dr. Porterfield diagnosed mild obstructive sleep apnea, but also found:

> This patient was also noted to have an increased number of spontaneous arousals. While this may be secondary to an exaggerated first-night effect, other possibilities include reflux, chronic pain or the upper airway resistance syndrome. If this latter diagnosis is responsible, this would significantly increase the number of arousals secondary to respiratory obstructive events.

In other words, Dr. Porterfield did not simply diagnose Plaintiff with mild obstructive sleep apnea, as found by the ALJ. The sleep apnea did result in 9.5 apneas and hypopneas per hour to arousal. Dr. Porterfield, however, additionally found significant that Plaintiff did not fall asleep for nearly three hours, then did not reach REM sleep for an additional two hours, meanwhile having 13.6 spontaneous (not necessarily apnea-related) arousals per hour.

The ALJ's sentence: "Ms. Smallwood has also been diagnosed with mild obstructive sleep apnea for which weight loss, dietary changes and even a dental device have been suggested" understates Dr. Porterfield's report. Dr. Porterfield' recommendations did include encouraging weight loss; a possible dental appliance, and dietary changes. He also found, however, that Plaintiff "may be a candidate for a surgical approach" and that a nasal CPAP "may be tried" if the patient wishes "or if daytime symptoms are strongly suspected to be secondary to OSA, or that "additional pain control at night may be indicated." Finally, he noted: If the attending physician felt that upper airway resistance syndrome was a possibility, this may strengthen the argument for CPAP trial.

In this instance, where the Social Security Administration itself has expressly and particularly noted that "some polio survivors . . . have reported the onset of sleep disorders years following the acute polio infection, and physicians have linked these sleep disorders to weakening of the respiratory musculature," and where Plaintiff was diagnosed with a medically determinable sleep disorder, the ALJ should have discussed SSR 03-1p in his decision.

The undersigned also finds the ALJ erred by determining Plaintiff's sleep impairment was a non-severe impairment. In Evans v. Heckler, 734 F.2d 1012 (4th Cir. 1984), the Fourth Circuit held that an impairment could be considered non-severe "only if it was a *slight abnormality* which had such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." (Emphasis in original). Plaintiff here exhibited a poor sleep efficiency of only slightly over 50%. The undersigned finds her poor sleep efficiency, with three hour latency to sleep and then 13.6 arousals per hour does not support a finding that her sleep impairment "would not be expected to interfere" with her ability to work. This is not to say that Plaintiff's sleep impairment, singly or in combination with her other impairments, is disabling, but merely that the evidence supports that it is a severe impairment.

Defendant argues that Plaintiff's claim that the ALJ erred by not linking her sleep disorder to her polio "has no merit because as the record shows, Plaintiff did not even bother returning to for [sic] follow-up care after being diagnosed with sleeping problems (Tr. 129). Moreover, treatment for Plaintiff's sleep condition was conservative, including a recommendation to lose weight." (Emphasis added). First, page 129 of the transcript, cited by the Commissioner, does not say whether or not Plaintiff "bothered to return" for follow-up care. That page is simply the report of her sleep study. Second, the Commissioner, like the ALJ before him, understates the specialist's

findings and recommendations. In fact, Plaintiff did present to her treating physician to follow up on the sleep study results. She was diagnosed with fatigue and myalgia–possibly fibromyalgia. She was prescribed Bextra for pain and Ambien for sleep, and discussed the possibility of a CPAP trial if her sleep did not improve with the additional pain control and sleep medication, all in line with the specialist's recommendations. About a month later, she did report she was sleeping better with Ambien and Lorcet. At the hearing, Plaintiff testified that she was taking Ambien, but only when she really couldn't sleep because it dragged her out and the next day she couldn't do anything (R. 217). The ALJ asked, "So it works?" and Plaintiff responded: "It works, yes. You can't comprehend what's going on the next day." The ALJ did not comment on this claimed side effect of Plaintiff's medication.

For all the above reasons, the undersigned finds substantial evidence does not support the ALJ's finding regarding Plaintiff's severe impairments and their affect on her ability to perform work, especially because he failed to discuss or even mention SSR 03-1p. The undersigned therefore recommends Plaintiff's 2004 claim be remanded to the Commissioner for further proceedings as to that claim only.

## V. RECOMMENDED DECISION

For the reasons above stated, the undersigned recommends Defendant's Motion for Summary Judgment [Docket Entry 9] be **DENIED**, and Plaintiff's Brief in Support of her Claim for Relief [Docket Entry 8] be **GRANTED** by reversing the Commissioner's decision under sentence four of 42 U.S.C. §§ 405(g) and 1383(c)(3), with a remand of the case only as to the 2004 claim to the Commissioner for further proceedings consistent and in accord with this Recommendation.

Any party may, within ten days after being served with a copy of this Report and

Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the Honorable Robert E. Maxwell, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _29_ day of _June_, 2009.


JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE